**CONNELL RICE & SUGAR CO., INC., Appellant,**

v.

**COUNTY OF YOLO, Appellee.**

**No. 75–2840.**

United States Court of Appeals, Ninth Circuit.

Feb. 13, 1978.

Stephen J. Schwartz (argued), of Schwartz & Lane, San Francisco, Cal., for appellant.

Charles R. Mack, Woodland, Cal., for appellee.

Before KILKENNY and WALLACE, Circuit Judges, and PALMIERI, District Judge.*

KILKENNY, Circuit Judge:

This appeal involves the validity of an *ad valorem* tax assessed by the County of Yolo on March 1, 1974, on certain rice owned by appellant. Appellant paid the tax and then instituted this action for a refund of the amount paid. It contends that the assess-ment was void in its entirety on the ground that the rice at the time of the assessment was in the export stream of commerce and constitutionally immune from local taxation under Article 1, § 10 of the Constitution of the United States.

## STATEMENT OF FACTS

Appellant is a New Jersey corporation engaged as a broker in the purchase and sale of rice and sugar. Appellee is a body corporate and a political subdivision of the state of California.

On February 7, 1974, the United States Department of Agriculture issued an autho-rization to Khmer Republic [Khmer] to pur-chase rice in the United States. Acting under this authorization, *Khmer* issued its invitation for bids on February 7, 1974. On February 13, 1974, appellant offered to sell the rice, and on February 15, 1974, con-firmed the acceptance of the offer and is-sued its declaration of sale. Between De-cember 12, 1973, and March 5, 1974, Farm-ers' Rice Cooperative delivered by common carrier several hundred thousand CWT of rice to storage facilities of the Port of Sac-ramento for the account of the appellant, where it remained pending inspection and arrival of several vessels chartered to carry the rice to *Khmer* and the Republic of South Vietnam. The bulk of the rice was shipped on five vessels leaving the Port of Sacramento between December 10, 1973, and February 24, 1974.

On February 15, 1974, appellant contract-ed with *Khmer* to sell a quantity of rice to be delivered by ship leaving the Port of Sacramento some time in March of that year. February 19, 1974, appellant was no-tified of the name of the vessel and its estimated, March 6, 1974, date of arrival in Sacramento. February 21, 1974, appellant gave instructions for the preparation of ex-port declarations to cover the shipment. On the same day, appellant filed its applica-tion with the California Department of Ag-riculture, Grain and Commodity Inspection,

---

* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

for the inspection of the rice to be shipped in export, advising the department of the approximate loading date, the name of the vessel and the total amount to be loaded.

As of March 1, 1974, the appellee's assessor, in conformity with California law, assessed the subject rice remaining in storage at the Port of Sacramento as being property within the state subject to local taxation. Pursuant to said assessment, taxes were levied by appellee against appellant on said property for the taxable year 1974–75 in the sum of $68,755.65. After appellant had petitioned for and been denied a cancellation of the tax it paid under protest the total amount of the levy.

The subject rice had been milled for export and on the date of the assessment the future commercial export of the rice to *Khmer* and *South Vietnam* was virtually certain.

Between March 10th and March 14, 1974, the vessel arrived and was loaded with the rice that had been subject to the March 1, 1974, assessment. On March 14th, a bill of lading for the rice shipment was issued, and the vessel set sail for *Vietnam* and *Khmer* and appellant was paid for the rice.

The above facts are taken mainly from the court's findings and are supported by the stipulation of facts and the documentary evidence.

### THE LAW OF THE CASE

■ While a case precisely in point has not been found, we believe that *Sumitomo Forestry Co., Ltd. v. Thurston County*, 504 F.2d 604 (CA9 1974), *cert. denied* 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975), and *Kosydar v. National Cash Register Co.*, 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974), are highly persuasive. Other helpful authorities include *Empresa Siderurgica, S.A. v. County of Merced*, 337 U.S. 154, 156, 69 S.Ct. 995, 93 L.Ed. 1276 (1949); *Richfield Oil Corp. v. State Board*, 329 U.S. 69, 79, 67 S.Ct. 156, 91 L.Ed. 80 (1946), and *Coe v. Errol*, 116 U.S. 517, 527, 6 S.Ct. 475, 29 L.Ed. 715 (1886). Although a state authority, *Farmers' Rice Cooperative v. County of Yolo*, 14 Cal.3d 616, 625, 122 Cal.Rptr. 65, 71, 536 P.2d 465, 471 (1975), is closely akin to our case and is an exceptionally well reasoned decision which we shall later mention.

In *Sumitomo*, certain logs were cut in the timber area of the state of Washington and transported by public carrier to a port in Thurston County where they were stored while awaiting shipment to Japan. All of the financial arrangements had been made and in view of the exporter's past practices, it was clear that the logs were destined for export. Nonetheless, our circuit held that the logs had not yet reached the stream of foreign commerce and, consequently, were not immune from state or county taxation. Relying heavily upon *Coe v. Errol, supra*, a case dealing with the point at which goods enter the stream of interstate commerce and thereby become protected by the interstate commerce clause from location taxation and *Kosydar v. National Cash Register Co., supra*, our circuit concluded that the *Coe* test for determining if goods were in interstate commerce would likewise be the standard for deciding when goods had entered the stream of export commerce. It so happened that the goods under scrutiny in *Coe* were logs, the same as in *Sumitomo*. Two collections of logs were involved in *Coe*. The Court held that the first collection was clearly in commercial transportation and, therefore, enjoyed constitutional protection from taxation. However, with reference to the second collection of logs which had been cut in New Hampshire and purchased by Coe to be floated out of the state, the interstate journey had not yet begun. Consequently, they were taxable.

In *Sumitomo*, the logs had neither been committed to a common carrier for export, nor loaded upon a ship that would take them to Japan. However, we do not believe that the fact that the rice here in question was subject to a future bill of lading for export is controlling. In *Sumitomo*, it was argued that the company's past practices indicated with reasonable certainty that the logs would be exported and, thus, no reasonable probability existed that the logs would be domestically diverted af-

ter escaping taxation. In answer to this contention, the *Sumitomo* court, citing *Empresa Siderurgica S.A. v. County of Merced, supra,* said: "Certainty of export evidenced by financial and contractual relationships does not by itself render goods 'exports' *before the commencement of their journey abroad.*" 504 F.2d at 608. [Emphasis supplied]. The court continued by saying that even if it accepted the assurances that the prospect of eventual exportation was virtually certain, the immunities of the import-export clause was unavailable absent an actual entrance of the logs *into the export stream. Carson Petroleum Co. v. Vial,* 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626 (1929), is distinguished by the *Sumitomo* court because in *Carson* the logs were awaiting shipment after traveling in interstate commerce to reach the port. Needless to say, once the logs had been subject to interstate commerce and had not reached their final resting place, they were no longer taxable.

This court is particularly aware of the difficult distinctions to be made in taxation cases such as this. As Mr. Justice Stewart wrote in *Kosydar*:

"It may be said that insistence upon an actual movement into the stream of export in the case at hand represents an overly wooden or mechanistic application of the *Coe* doctrine. This is an instance, however, where we believe that simplicity has its virtues. The Court recognized long ago that even if it is not an easy matter to set down a rule determining the moment in time when articles obtain the protection of the Import-Export Clause, 'it is highly important, both to the shipper and to the State, that it should be clearly defined as to avoid all ambiguity or question.' [Citation omitted]." *Kosydar v. National Cash Register Co., supra,* 417 U.S. at 71, 94 S.Ct. at 2113.

We are mindful of certain language in *Sumitomo* that the goods had not become exports because they had not "been committed to a common carrier for export" or "loaded upon the ship." 504 F.2d at 607. Although these tests may initially appear to

set the export standard, they must be read in light of the court's later qualification that the "immunities of the import-export clause are unavailable absent an actual *entrance* of the appellee's logs into the export stream." [Emphasis supplied]. Manifestly, goods merely committed cannot be said to have entered the export stream. A broad definition of commitment such as evidenced by contracting to sell the rice and filing a government declaration form to ship it might enable an exporter to store these "committed" goods for long periods of time without taxation. Such a gloss must be rejected. *Joy Oil Co. v. State Tax Comm'n,* 337 U.S. 286, 69 S.Ct. 1075, 93 L.Ed. 1366 (1949). Moreover, the evidence clearly shows that another important document evidencing a commitment, the bill of lading, was not issued until March 14, 1974, well after the disputed tax assessment. It would seem that the word "committed" as employed by the court in *Sumitomo* was used to mean "delivered" to a common carrier. Otherwise, the subsequent language of the court is meaningless. Inasmuch as the bill of lading was not issued prior to the taxing date and that no other documentary evidence exists to support a commitment, we reject appellant's commitment claim.

In *Sumitomo,* the court in footnote 7 [504 F.2d 609, n. 7] reserved passing on a situation where goods are consigned to a common carrier within a state and are delayed at the interface of two modes of transportation prior to leaving the state while still within control of the common carrier. Appellant argues that it falls within this stated reservation. We disagree. Here, the rice was transported by common carrier to the port at Sacramento, but once there the carrier's involvement ceased. That the use of a common carrier merely to carry goods from one resting place to another within the same state is clearly insufficient to commence the exportation process is made clear by *Coe, Kosydar,* and *Farmers' Rice Cooperative v. County of Yolo, supra.* While *Farmers' Rice Cooperative* is a state case, and not controlling on us, it correctly states the law on this subject and is highly convincing.

518

Moreover, a "virtual certainty" of shipment to Japan evidenced by a financial and contractual relationship fails to place the subject rice in the stream of commerce so as to prevent taxation by the local authority. *Empresa Siderurgica, S.A. v. County of Merced, supra; Kosydar v. National Cash Register Co., supra,* 417 U.S. at 70, 94 S.Ct. 2108. Inasmuch as the rice was in storage and had not yet begun a final movement from the state of its origin to the country of its destination, it was not immune from nondiscriminatory local taxation.

CONCLUSION

The judgment of the district court is affirmed.

IT IS SO ORDERED.